UNITED STATES BANKRUPTCY COURT

For The Northern District Of California

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| In re | ] | Case No. 01-53251-ASW |
|---|---|---|
| | ] | |
| Jacqueline C. Melcher, aka | ] | Chapter 11 |
| Jacqueline Carlin, | ] | |
| | ] | |
| Debtor. | ] | |
| | ] | |

MEMORANDUM DECISION
OVERRULING OBJECTION TO CONFIRMATION AND
CONFIRMING JOINT PLAN OF REORGANIZATION

Before the Court is the Joint Plan of Reorganization ("Plan"), proposed for confirmation by Jacqueline C. Melcher ("Debtor"), the Debtor in this Chapter 11[1] case, and the Official Committee of Unsecured Creditors ("Committee"). An objection to confirmation has been filed by the Estate of Terrence P. Melcher ("Creditor").[2]

Debtor is represented by Terrance L. Stinnett, Esq. and Dennis D. Davis, Esq. of Goldberg, Stinnett, Meyers & Davis. The Committee is represented by John D. Fiero, Esq. of Pachulski,

---

[1] Unless otherwise noted, all statutory references are to Title 11, United States Code ("the Bankruptcy Code"), as amended on October 22, 1994.

[2] An objection to confirmation was also filed by Wells Fargo Bank, NA, but that objection has been resolved by stipulation.

Stang, Ziehl, Young, Jones, & Weintraub P.C. Creditor is represented by Lance N. Jurich, Esq. of Loeb & Loeb LLP. The matter has been submitted for decision after trial and post-trial briefing. At trial, Debtor and Committee called Kevin A. Spellman ("Spellman"), an appraiser, and Debtor[3] as witnesses. Creditor called Rita E. Spence ("Spence"), an appraiser, as its witness.

This Memorandum Decision constitutes the Court's findings of fact and conclusions of law, pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## I.

### BACKGROUND

Debtor commenced this case by filing a petition under Chapter 11 of the Bankruptcy Code on June 28, 2001. Debtor's main assets are her interests in five pieces of real property.

Creditor is the probate estate of Debtor's former husband Terrence Melcher. The estate asserts an ownership interest in two properties that are part of Debtor's estate as well as a $168,839.05 unsecured claim based on other alleged rights of Terrence Melcher in the state court marital dissolution proceeding with Debtor.

The Plan proposes that the holders of security interests in Debtor's various properties will retain their security interests pursuant to their loan documents. Debtor will pay the secured tax claim of Monterey County in equal monthly installments within 120 days after confirmation. The Plan also provides that allowed

---

[3] Debtor submitted her direct testimony by declaration and was cross-examined by Creditor at trial.

general unsecured claims, except the claims of Creditor and Ryan
Melcher ("Ryan"), will be paid in full plus post-petition interest
of 5%, five days after the Effective Date.  Ryan's claim is not
impaired under the Plan.

Regarding Creditor's claim, the Plan proposes that the two
properties in which Creditor holds an alleged community property
interest -- certain real property in Martha's Vineyard,
Massachusetts ("Stonewall Beach Property") and the family residence
located in Carmel, California ("Family Residence") -- shall remain
as property of the estate under 11 U.S.C. §541 and subject to the
automatic stay of 11 U.S.C. §362(a) until the respective rights of
Debtor and Creditor are finally resolved in the California State
Court.[4]

The Plan has been accepted by two impaired classes.  Creditor
was deemed unimpaired under the Plan and did not vote.  If Creditor
had voted, Creditor would have voted to reject the Plan.

Creditor objects to the Plan as follows:

1/  Creditor is impaired under the Plan and was not permitted
to vote, so the solicitation process of the Plan violates the
Bankruptcy Code and Rules, compliance with which is a prerequisite
to confirmation pursuant to 11 U.S.C. §1129(a)(1).

2/  The Plan has not been proposed in good faith, which is a
prerequisite to confirmation pursuant to 11 U.S.C. §1129(a)(3).

_____
[4]  The California State Court includes all trial and appellate
state courts that the Dissolution Proceeding issues will be before
-- until such issues are determined by final and non-appealable
orders.

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

MEMORANDUM DECISION OVERRULING
OBJECTION TO CONFIRMATION AND

3/    Confirmation of the Plan is likely to be followed by a liquidation or need for further reorganization, which violates 11 U.S.C. §1129(a)(11).

4/    The Plan does not propose to pay Creditor at least as much as Creditor would receive if Debtor's estate were liquidated under Chapter 7, which is a prerequisite to confirmation pursuant to 11 U.S.C. §1129(a)(7)(A)(ii).

5/    The Plan is not "fair and equitable" to Creditor within the meaning of 11 U.S.C. §1129(b)(1), inasmuch as it violates 11 U.S.C. §1129(b)(2)(B).

II.

FACTS

Debtor and Creditor are former spouses and have been involved in a marital dissolution action ("Dissolution Proceeding") in the Monterey County Superior Court ("Monterey State Court") for many years.

Pre-petition, the Monterey State Court determined in the Dissolution Proceeding what property was community property and what property was separate property.  With respect to Stonewall Beach Property, the Monterey State Court determined that Debtor held a separate property interest in it to the extent of $800,000, and that the property was otherwise community property.  In November 2000, the Monterey State Court ordered that Stonewall Beach Property be listed for sale at $12,000,000; in February 2001, the Monterey State Court ordered that an offer for that amount be accepted.

1    Ryan is the son of Debtor and Terrence Melcher. Pre-petition,

2  he filed an action in State Court in Massachusetts contending that

3  his parents had previously agreed to hold Stonewall Beach Property

4  in trust for him. In that action, he sought an injunction to

5  prevent the sale of Stonewall Beach Property that had been ordered

6  by the Monterey State Court. The injunction was denied, but the

7  Massachusetts State Court did permit Ryan to maintain a recorded

8  notice of a _lis_ _pendens_ asserting an interest in the property.

9    Escrow for sale of Stonewall Beach Property was due to close

10  on June 29, 2001, but the escrowholder would not insure the buyer's

11  title due to the cloud represented by Ryan's notice of _lis_ _pendens_.

12  The escrowholder agreed to "close around" the _lis_ _pendens_ and

13  insure title if it was indemnified by having $8,000,000 of proceeds

14  impounded for its use in litigating Ryan's claim. On or about

15  June 25, 2001, at the request of Creditor's attorney in the

16  Dissolution Proceeding, the Monterey State Court issued an order

17  imposing such an impound for purposes of indemnifying the

18  escrowholder. The day before close of escrow, Debtor filed her

19  Chapter 11 petition and the automatic stay of §362(a) prevented

20  escrow from closing.

21    Pre-petition, Debtor moved for reconsideration, filed appeals,

22  and sought writs concerning many of the Monterey State Court's

23  orders. Debtor appealed the Monterey State Court's order directing

24  sale of Stonewall Beach Property and sought a stay of the sale

25  pending appeal; stay was granted on condition that a bond of

26  $7,420,000 be posted, which Debtor credibly states that she was

27  unable to do. Creditor does not contend that Debtor had or has an

28  ability to post a bond in that amount.

1    Debtor filed her bankruptcy case in part due to her lack of

2  funds.  Between 1996 and 2001, the proposed purchaser of Stonewall

3  Beach Property had rented that property for six weeks during the

4  summer.  In 2001, in anticipation of his purchase of the property,

5  the purchaser withheld his $40,000 rental payment due Debtor.  In

6  addition, Terrence Melcher had ceased making debt service and other

7  expenses on the Stonewall Beach Property and the Family Residence

8  since his separation from Debtor and had failed to pay child

9  support to Debtor for five years.  At the time of Debtor's

10  separation from Terrence Melcher, Debtor had only $35,000 in debt

11  on one of her separate properties and ended up borrowing $800,000

12  on that property in large part to pay debt service on Stonewall

13  Beach Property.

14    During Debtor's bankruptcy case, Creditor filed a motion for

15  relief from stay.  On October 8, 2002, this Court denied Creditor's

16  motion and ordered, with Debtor's agreement, that to the extent

17  that Creditor has an interest in Stonewall Beach Property, Debtor's

18  interest in Stonewall Beach Property shall provide adequate

19  protection for any diminution of value to that property as of

20  December 4, 2001.  At trial, the parties agreed that for purposes

21  of adequate protection, Creditor's interest in Stonewall Beach

22  Property as of December 4, 2001 is $4,440,000.

23    At trial, each party offered expert witnesses to opine as to

24  the current value of Stonewall Beach Property.  Debtor's witness

25  Spellman is an appraiser of residential real estate who was

26  qualified to testify as an expert concerning the value of

27  residential properties on Martha's Vineyard.  Creditor's witness

28  Spence is an appraiser of commercial and residential real property

1   who was qualified to testify as an expert concerning the value of

2   residential properties on Martha's Vineyard and also on discount

3   rates.

4        Spellman testified that he believed the fair market value of

5   Stonewall Beach Property was $13,000,000 as of May 20, 2005.  He

6   based that conclusion upon a cost analysis and a sales comparison

7   analysis after a personal visit to Stonewall Beach Property.

8   Spellman reviewed six comparable properties on Martha's Vineyard in

9   determining his value -- three oceanfront properties in a nearby

10  town of West Tisbury, one ocean view property in Chilmark, and two

11  pond front properties in Edgartown, on the other side of Martha's

12  Vineyard.  Spellman determined that the value of Stonewall Beach

13  Property ranged from $12,000,000 to $16,000,000 based on

14  adjustments to the comparable properties and was $11,353,600 based

15  on his cost analysis.

16       Spellman has been an appraiser on Martha's Vineyard since

17  1985.  He explained that ocean front property, like the Stonewall

18  Beach Property, is superior in value to ocean view property.  With

19  ocean front property, the owner owns the land to the high mean tide

20  mark, essentially where the water meets the land.  With ocean view

21  property, the owner does not own the land in front of the property.

22  Spellman testified that in Chilmark, Massachusetts, the town

23  closest to Stonewall Beach Property, the town leases land to permit

24  the public to have access to the beach, so ocean front property is

25  at a premium.  While the Stonewall Beach Property is right on the

26  ocean, it is does not have beach access since the property meets

27  the water at a 20 to 30 foot cliff.  Stonewall Beach Property holds

28  a deeded easement across the property next door to gain access to

the beach. The deeded easement is a 3-foot wide path -- it is less than 1,000 feet from the house to the beach along that path.

Spellman testified that Chilmark has approximately 17 to 24 sales per year and most of those properties are not ocean front properties. The number of sales is low because the entry level price for a 1 to 2 bedroom home on at least 3 acres of property that is in the woods and requires the owner to drive to the beach is $1,000,000. Spellman stated that the small number of sales does not indicate a lack of demand for property because few properties are offered for sale. He also explained that the real estate market is still rising on Martha's Vineyard and prices have risen by 20% since 2002. Spellman testified that Stonewall Beach Property is well-known on Martha's Vineyard and, if put up for sale, would likely produce multiple bids.

Spellman noted that, on the property adjacent to Stonewall Beach Property that the deeded easement crosses, a new structure is under construction. Spellman testified that there is currently a new foundation poured and some framing in place. Spellman believes that the new structure will not obscure the ocean views from the upper floors of the house on Stonewall Beach Property, although it will likely obscure some of the current views from lower parts of the property. Additionally, the foundation is currently in the deeded easement, so a new path will need to be created for the deeded easement. Although he vacillated somewhat at first, Spellman testified that he incorporated these events into his valuation by taking a value of the property from the lower end of his value range to account for the new structure. Spellman believes that buyers would pay $13,000,000 today for Stonewall

Beach Property knowing that a new structure was being built next door that will likely obscure some of the current lower views from Stonewall Beach Property.

Spence conducted an appraisal of Stonewall Beach Property in 1999 but did not visit the property for this matter and did not update her appraisal. Spence valued Stonewall Beach Property at $5,300,000 as of June 14, 1999. Spence has been an appraiser on Martha's Vineyard since 1993. Spence testified that any appraisal of Stonewall Beach Property would need to be discounted by 15% because this type of property would take an average of 510 days to sell and, based upon Spence's conversations with seven other brokers on Martha's Vineyard, there is increasing resistance to sales of property on the upper end of the market, like Stonewall Beach Property.

Debtor filed an equity analysis hypothesizing the sale of all of her properties. As of March 4, 2005, Debtor expects net proceeds after deduction of selling expenses and payment of taxes on the gain for her properties as follows:

| Property | Value | Mortgage | Equity | Net Proceeds |
|----------|-------|----------|--------|--------------|
| Stonewall Beach | $12,000,000 | $2,098,266 | $9,901,734 | $3,024,951[5] |
| Moshup Trail | 1,500,000 | 769,947 | 730,053 | 207,117[6] |
| Holt Road | 3,350,000 | 1,575,406 | 1,774,594 | 691,617[7] |

---

[5] Debtor projects $720,000 in selling expenses and $3,131,832 in taxes on the gain. The net proceeds represents Debtor's 1/2 community property interest in this property.

[6] Debtor projects $120,000 in selling expenses and $402,936 in taxes on the gain. Creditor does not allege any community property interest in this property.

[7] Debtor projects $201,000 in selling expenses and $881,977 in taxes on the gain. Creditor does not allege any community property interest in this property.

| 25535 Tierra Grande | 1,500,000 | 642,085 | 857,915 | 619,265[8] |
| Family Residence | 1,240,000 | 675,000 | 565,000 | 226,923[9] |

Debtor testified that the net proceeds do not account for the approximately $1,800,000 of her separate funds she has expended since 1997 in connection with paying debt service, property taxes and maintenance to protect the value of Stonewall Beach Property and the over $200,000 of her separate funds Debtor put into the Family Residence prior to Creditor being added to the title. If Creditor is found to have a community property interest in Stonewall Beach Property or the Family Residence, Debtor would assert these expenditures as offsets to any monies owed to Creditor.

Post-petition, Debtor also received Court authority to borrow $1,400,000 as a second mortgage against Stonewall Beach Property. From the loan funds, Debtor sequestered approximately $140,000 ("Sequestered Account") to fund the loan payments for the first year. At the time of trial, Debtor had approximately $43,000 in the Sequestered Account to pay the second mortgage payments on Stonewall Beach Property through September 2005.

Debtor currently rents out each of her properties. However, the rents received on Stonewall Beach Property are insufficient to pay the debt service on that property once the funds in the Sequestered Account run out this October, so Debtor will need to

---

[8] Debtor projects $120,000 in selling expenses and $118,650 in taxes on the gain. Creditor does not allege any community property interest in this property.

[9] Debtor projects $99,200 in selling expenses and $11,954 in taxes on the gain. The net proceeds represents Debtor's 1/2 community property interest in this property.

provide additional funds to cover the shortfall. There are several ways in which Debtor can easily satisfy this shortfall.

First, Debtor has a bank account that includes the net proceeds from the borrowing of $1,400,000 secured by Stonewall Beach Property (not including the funds put in the Sequestered Account discussed above) and the refinancing of the Holt Road Property ("Impound Account"). Debtor has a commitment from Cedar Mortgage Company to lend Debtor $1,000,000 secured by property located at 25535 Tierra Grande, Carmel, California ("Tierra Grande Rental Property").[10] Debtor testified that there will be $1,409,663 in the Impound Account once her loan with Cedar Mortgage Company has closed. That loan is ready to close upon this Court's confirmation of the Plan. After Debtor pays all claims that need to be paid on the Effective Date of the Plan, there will be approximately $280,950 remaining in the Impound Account. Those funds can be used to pay debt service on Stonewall Beach Property after the funds in the Sequestered Account are depleted -- until Debtor either refinances or sells one of her properties. This will provide Debtor with approximately two years worth of payments for the Stonewall Beach Property second mortgage.

Second, Debtor testified at trial that she talked with a real estate broker about selling the Tierra Grande Rental Property and, based on an increase in the value to $1,800,000 and a decrease in the debt, that property currently has approximately $1,200,000 in equity. Debtor used an 8% estimate of the selling costs for the property ($144,000) and the Court projects that taxes on the gain

---

[10] The Cedar Mortgage Company loan will take out the approximately $650,000 of secured debt on the Tierra Grande Rental Property and provide Debtor with $350,000 in additional funds.

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

would increase to $206,550,[11] leaving Debtor with net proceeds of approximately $450,000[12] if she were to sell the Tierra Grande Rental Property at $1,800,000 after confirmation.

Debtor also presented credible evidence that, _arquendo_, if Stonewall Beach Property were valued today at $9,000,000 (a figure far below what this Court finds the property is worth) and were sold in one year, Debtor's interest in Stonewall Beach Property would have sufficient equity to cover any diminution of value of Creditor's stipulated $4,440,000 interest as of December 4, 2001. Debtor assumed that the hypothetical $9,000,000 value today would be decreased by 10% for delay, leaving $8,100,000 present value for the property. From that amount, Debtor deducted costs of sale of $486,000 and the community mortgage of approximately $700,000 for net proceeds of $6,914,000 to be divided between Creditor and Debtor. Each party would receive $3,457,000, from which Debtor's $800,000 separate property interest would be deducted from Creditor's interest and added to Debtor's interest, leaving Creditor with a $2,657,000 distribution and Debtor with a $4,257,000 distribution.

Under the stipulation against diminution of value, Debtor would owe Creditor an additional $1,783,000 from her $4,257,000

---

[11] Debtor stated that the Tierra Grande Rental Property had a taxable gain of $404,949 with a value of $1,500,000. Increasing the taxable gain by the additional $300,000 in value and multiplying $704,949 by 20% for federal capital gains taxes ($140,990) and 9.3% for state capital gains taxes ($65,560), the Court estimates taxes on the gains to total $206,550.

[12] This number is lower than the equity shown by Debtor as of March 4, 2005 because in Debtor's calculations the secured debt against the property is $642,085 while the Cedar Mortgage Company loan (which will pay off the $642,085 secured debt) is for $1,000,000.

distribution to bring Creditor's portion to $4,440,000.  Thus, after

the additional payment to Creditor and repayment of Debtor's

$1,400,000 loan against Stonewall Beach Property, Creditor would

receive $4,440,000 and Debtor would receive $1,074,000 from the

hypothetical $9,000,000 sale one year from now.

Creditor asserts that it may be owed interest at the rate of

10% on the Monterey State Court's determination of community

property, totaling approximately $2,220,000 a year from now and

Debtor's interest would not cover that payment.  The parties agreed

that Debtor's $9,000,000 sale analysis did not cover Creditor's

interest argument or Debtor's alleged offsets.[13]

### III.

### ANALYSIS

As set forth above, Creditor's objections to confirmation

require consideration of whether the following criteria for

confirmation have been met:

1/   Solicitation of the Plan complies with the Bankruptcy Code

and Rules, as required by 11 U.S.C. §1129(a)(1).

2/   The Plan must have been proposed in good faith, as

required by 11 U.S.C. §1129(a)(3).

3/   Confirmation of the Plan is not likely to be followed by a

liquidation or need for further reorganization, as required by

11 U.S.C. §1129(a)(11).

---

[13] Because Creditor asserts an <u>ownership</u> (community property)
interest in two properties in Debtor's estate, Creditor's argument
that it is entitled to interest is not self-evident.

4/    The Plan must propose to pay Creditor at least as much as Creditor would receive if Debtor were liquidated under Chapter 7, as required by 11 U.S.C. §1129(a)(7)(A)(ii).

5/    The Plan must be "fair and equitable" to Creditor within the meaning of 11 U.S.C. §1129(b)(1) by not violating the Absolute Priority Rule of 11 U.S.C. §1129(b)(2)(B)(ii).

As the proponents of the Plan, Debtor and Committee bear the burden of establishing each of these elements, see In re Acequia, Inc., 787 F.2d 1352 (9th Cir. 1986), by a preponderance of the evidence, see In re Arnold and Baker Farms, 177 B.R. 648 (9th Cir. BAP 1994), aff'd, 85 F.3d 1415 (9th Cir. 1996), cert. denied, 519 U.S. 1054, 117 S.Ct. 681 (1997).

A. Plan Solicitation

Creditor contends that its class (Class 10) is impaired under the Plan and is entitled to vote.[14]  Because the Plan deemed its class to be unimpaired, it did not receive a ballot.  Creditor contends that Debtor's failure to solicit Creditor's vote on the Plan means the Plan does not comply with 11 U.S.C. §1126[15] and, therefore, the Plan cannot be confirmed under 11 U.S.C. §1129(a)(1).

---

[14] Under Bankruptcy Codes section 1124(1), a creditor is impaired under the Bankruptcy Code if the plan alters that creditor's legal, equitable or contractual rights.

[15] Bankruptcy Code section 1126(a) provides:

> The holder of a claim or interest allowed under section 502 of this title may accept or reject a plan.  If the United States is a creditor or equity security holder, the Secretary of the Treasury may accept or reject the plan on behalf of the United States.

1   Creditor claims it is impaired because the Plan alters its

2   rights in that the Plan: (1) fails to provide post-petition interest

3   on the Monterey State Court order; (2) permits Debtor to continue

4   prosecuting the California State Court appeals without posting an

5   appeal bond; (3) prevents Creditor from enforcing the Monterey State

6   Court order immediately; and (4) contains only a naked promise that

7   Creditor will be paid once Creditor's claims are allowed.

8   Debtor claims that her treatment of Creditor under the Plan

9   does not impair Creditor because the continuation of the automatic

10  stay under the Plan does not alter Creditor's rights that Creditor

11  currently holds, citing In re PPI Enterprises (U.S), Inc., 324 F.3d

12  197 (3rd Cir. 2003) ("PPI Enterprises") and In re American Solar

13  King Corp., 90 B.R. 808 (Bankr. W.D. Tex. 1988) ("Solar King").

14  In PPI Enterprises, the debtor's former landlord objected to

15  the debtor's proposed plan of reorganization because the plan capped

16  the landlord's damages pursuant to 11 U.S.C. §502(b)(6) and treated

17  the landlord as unimpaired.  The Third Circuit held that because

18  11 U.S.C. §502(b)(6) altered a creditor's non-bankruptcy claim

19  irrespective of any proposed plan, the proposed plan could not

20  depart from that limitation and the plan did not alter the

21  landlord's legal, equitable or contractual rights, stating:

22          A plan which "leaves unaltered" the legal rights
            of a claimant is one which, by definition, does
23          not impair the creditor.  A plan which leaves a
            claimant subject to other applicable provisions
24          of the Bankruptcy Code does no more to alter a
            claimant's legal rights than does a plan which
25          leaves a claimant vulnerable to a given state's
            usury laws or to federal environmental laws.
26          The Bankruptcy Code itself is a statute which,
            like other statutes, helps to define the legal
27          rights of persons, just as surely as it limits
            contractual rights.  Any alteration of legal
28          rights is a consequence not of the plan but of
            the bankruptcy filing itself.

Case 01-53251   Doc# 1046   Filed 07/25/05   Entered: 07/28/05 11:44:38   Page 15
of 31

1  PPI Enterprises, 324 F.3d at 204 (quoting Solar King, 90 B.R. at

2  819-20).

3      Similarly, in Solar King, the creditor objected to its

4  treatment as a subordinated creditor pursuant to 11 U.S.C. §510(b).

5  The Bankruptcy Court held that to the extent that the proposed plan

6  provided the creditor with the same treatment as provided in the

7  express provisions of 11 U.S.C. §510(b), the plan did not impair the

8  creditor.  "To the extent the plan goes beyond Section 510(b) to

9  deprive them of any property on account of their claims, it impairs

10 the class."  Solar King, 90 B.R. at 822.

11     Here Debtor argues that because Stonewall Beach Property and

12 the Family Residence remain property of the estate under the Plan

13 and subject to the automatic stay, the Plan does not alter

14 Creditor's rights.  Creditor currently is subject to the provisions

15 of the automatic stay and will remain subject to them after

16 confirmation of the Plan.

17     Bankruptcy Code Section 1141(b) permits a debtor to maintain

18 property in a confirmed plan as property of the estate.[16]

19 Bankruptcy Code section 362(c)(1) provides that the automatic stay

20 continues so long as such property remains property of the estate.

21 Thus, the Plan's provision for retention of the automatic stay is

22 expressly authorized by the Code -- the treatment of Class 10 does

23 not alter Creditor's current legal, contractual or equitable rights

24 and the Plan does not impair Creditor.

---

26 [16] Bankruptcy Code section 1141(b) provides:

27     Except as otherwise provided in the plan or the
28     order confirming the plan, the confirmation of
       a plan vests all of the property of the estate
       in the debtor.

MEMORANDUM DECISION OVERRULING
OBJECTION TO CONFIRMATION AND
CONFIRMING JOINT DEBTOR'S PLAN OF REORGANIZATION

Creator's argument that the Plan only provides it with a naked promise to pay is simply incorrect. The Plan provides Creditor with whatever legal rights the California State Court determines that Creditor holds -- no more, no less. Thus, for example, if the California State Court were to determine that Creditor has a community property interest in the Stonewall Beach Property, then Creditor will have such an interest under the Plan. The Plan is straightforward in this respect. Moreover, because the Stonewall Beach Property and the Family Residence remain property of the estate pursuant to the Plan, Debtor cannot sell or hypothecate them without further court order -- on notice to Creditor. Therefore, the Plan provides Creditor with far more legal rights than a naked promise to pay.

Even, assuming _arguendo_, the Court had found that the Plan impairs Creditor's claim, Creditor has confirmed that it would vote against the Plan. The parties submitted post-trial briefing on whether, assuming Creditor is impaired by the Plan, Debtor's failure to solicit Creditor's vote is fatal to confirmation of the Plan. None of the parties found a case determinative of the issue. The case most directly related to this issue is _In re Jones_, 32 B.R. 951 (Bankr. D. Utah 1983). In _Jones_, the debtors' plan proposed to cure the defaults of two creditors by making monthly installment payments commencing 30 days after the effective date. The plan stated that those creditors were not impaired. At the confirmation hearing, the bankruptcy court _sua sponte_ questioned whether those creditors were impaired. The bankruptcy court held that such treatment did impair those creditors and if the debtors proposed to treat the creditors in that fashion, the debtors "must amend the plan to specify that

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

MEMORANDUM DECISION OVERRULING
OBJECTION TO CONFIRMATION AND

Case: 01-53251 Doc# 1046 Filed: 07/25/05 Entered: 07/28/05 11:44:38 Page 17 of 31

classes B-2 and B-3 are impaired and permit them to vote." <u>Jones</u>, 32 B.R. at 960. However, the <u>Jones</u> court did not reach the question whether the creditors could be assumed to have voted against the plan for confirmation purposes and there is no holding that such a modification and voting could not be summarily conducted. Moreover, <u>Jones</u> is not binding authority in any event.

In this case, if the Court were to determine that Creditor was impaired, Creditor has stated clearly that it would vote against the Plan, so there is nothing to gain by requiring Debtor and the Committee to modify the Plan, solicit Creditor's vote and, absent a Court order shortening the period, wait 20 days for Creditor to send in a ballot rejecting the Plan. It would be a futile exercise. Plus, Creditor has filed its objections to plan confirmation -- which the Court has carefully considered. The parties fully briefed Creditor's objections and the Court has conducted an evidentiary hearing on those objections that contained factual elements. Creditor has made its position on the Plan perfectly clear. The Court will deem that if Creditor were impaired, Creditor would vote to reject the Plan and so the Court will evaluate whether Debtor and the Committee meet the requirements of 11 U.S.C. §1129(b)(1).

## B. Good Faith

The term "good faith" in the context of 11 U.S.C. §1129(a)(3) is not statutorily defined but has been interpreted by case law as referring to a plan that "achieves a result consistent with the objectives and purposes of the Code." <u>In re Sylmar Plaza, L.P.</u>, 314 F.3d 1070, 1074 (9th Cir. 2002), <u>cert. denied</u>, 538 U.S. 1035, 123 S.Ct. 2097 (2003), citing <u>In re Corey</u>, 892 F.2d 829, 835 (9th

Cir. 1989), <u>cert. denied</u>, 498 U.S. 815, 111 S.Ct. 56 (1990). "The requisite good faith determination is based on the totality of the circumstances." <u>Id.</u>, citing <u>In re Stolrow's, Inc.</u>, 84 B.R. 167, 172 (9th Cir. BAP 1988).

Creditor asserts that the Plan is not proposed in good faith because the Plan: (1) provides for indefinite imposition of the automatic stay; and (2) improperly provides for preempting of state court orders. Neither of these are the case.

First, while the Plan does provide for the continuation of the automatic stay with respect to Creditor's Class 10, under Plan section IV.A.10.a.iii., that stay lifts "at such time as all issues in the Dissolution Proceeding have been determined by final and non-appealable orders, except those involving child or spousal support." Plan at 11:3-5. Thus, the automatic stay lifts when the Dissolution Proceeding is complete and the stay has a definite termination.

Moreover, confirmation of a plan in a bankruptcy case is legitimate when the filing debtor is faced with an appeal bond that would severely disrupt its business. <u>In re Marshall</u>, 298 B.R. 670 (Bankr. C.D. Cal. 2003). In <u>Marshall</u>, the debtors filed their bankruptcy petition on the eve of a hearing where a creditor sought an order requiring the debtors to transfer substantially all of their assets to Texas to satisfy a $12 million judgment in probate court. The judgment was on appeal and required an $18 million appeal bond. The debtors did not have sufficient liquid assets to post a bond of this size and the bankruptcy court found that the

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1  debtors' plan of reorganization was filed in good faith. <u>Marshall</u>,

2  298 B.R. at 683-84.[17]

3      Here Debtor does not have sufficient liquid assets to post the

4  required $7,420,000 appeal bond and Creditor does not claim that she

5  does. Debtor supports herself in large part from the rental income

6  of her properties and so selling those properties would eliminate

7  that rental income. Debtor's proposal to pay her general unsecured

8  creditors in full and keep the Stonewall Beach Property and the

9  Family Residence as part of the estate until the Dissolution

10 Proceeding is complete is consistent with the objectives and

11 purposes of the Code. Debtor merely seeks to complete the

12 California State Court litigation and receive a determination of the

13 parties' respective legal rights. Creditor is fully protected by

14 the retention of the two properties to insure that its claim will be

15 paid, if upheld on appeal, and Debtor is permitted to pursue her

16 appeal without having to liquidate the real property that provides

17 her income.

18     Second, the Plan does not preempt state court orders. Under

19 Plan section IV.A.10.a.ii., both Debtor and Creditor are "bound by

20 the terms of any final non-appealable orders made and entered in the

21 Dissolution Proceeding whether at the appellate level or at the

22 trial court level." Plan at 10:23-24. The Plan does reserve

23 Debtor's right to object to the allowance of any proof of claim or

24 request for payment of expense of administration filed by Creditor

25 in this case, but that caveat does not mean Debtor has the right to

26 

27     [17] In <u>Marshall</u>, the debtors' plan originally proposed to pay
   the judgment creditor in full, however the judgment creditor failed

28 to file a proof of claim in the bankruptcy case. The debtors
   amended their plan to discharge the judgment creditor's unfiled
   claim.

relitigate the California State Court proceedings in this Court and Debtor has stated that she will not.[18]

Moreover, the fact that the Plan leaves the automatic stay in place pending the California State Court decision in the Dissolution Proceeding does not leave Creditor without legal rights. Creditor is free to file a motion to lift the automatic stay at anytime and a decision by the bankruptcy court to grant or deny such a motion is appealable. As noted above, Bankruptcy Code section 1141(b) expressly permits a debtor to maintain property in a confirmed plan as property of the estate.

The Court finds that the Plan is proposed in good faith pursuant to 11 U.S.C. §1129(a)(3).

### C. Feasibility

The Court can confirm a plan only if the Court determines that confirmation is not likely to be followed by liquidation, or the need for further reorganization pursuant to 11 U.S.C. §1129(a)(11); this is commonly referred to as the "feasibility" requirement.

> To demonstrate that a plan is feasible, a debtor need only show a reasonable probability of success. The Code does not require the debtor to prove that success is inevitable, and a relatively low threshold of proof will satisfy §1129(a)(11), so long as adequate evidence supports a finding of feasibility. [Citations omitted].

In re Brotby, 303 B.R. 177, 191 (9th Cir. BAP 2003).

Creditor claims the Plan is not feasible because success of the Plan depends upon Debtor's success in her appeals, her ability to service her debt, stagnant interest rates, and real estate market

---

[18] This Court's order confirming the Plan will also so provide.

MEMORANDUM DECISION OVERRULING
OBJECTION TO CONFIRMATION AND
CONFIRMING JOINT PLAN OF REORGANIZATION

conditions.  Further, according to Creditor, Debtor will not be able to pay Creditor's obligations after the Effective Date.

Debtor testified credibly that all general unsecured claims will be paid from the Impound Account and additional funds from the Cedar Mortgage Company loan.  Debtor will provide a reserve for contested claims.  Debtor will have sufficient funds to pay the administrative claims not subject to subordination and all general unsecured claims with interest.  Debtor also testified credibly that she has over $3,350,000 in equity in her separate properties and will have $324,000 in excess funds between the Impound Account and the Sequestered Account to service the second mortgage on Stonewall Beach Property after payments required on the Effective Date to provide a cushion for payment of debt service until one of her properties sells.[19]  Debtor testified that she recently talked with a real estate broker about selling the Tierra Grande Rental Property and that property has approximately $1,200,000 in equity.  Debtor believes the property can sell quickly, taking less time than the normal one year it takes to sell multi-million dollar homes.  The Court finds there will be sufficient liquid funds in the future to service the debt on the various properties.

Finally, Stonewall Beach Property and the Family Residence remain property of the estate under the Plan and Debtor cannot sell or further encumber those properties without a court order.  Thus, those properties will be available to pay Creditor should its claim

---

[19] The $324,000 is comprised of the $43,000 in the Sequestered Account and the approximately $280,950 remaining in the Impound Account after all claims that need to be paid on the Effective Date are paid.

1  be upheld in the California State Court.  There is sufficient equity

2  in these properties to insure Creditor will be paid.

3      The Court specifically finds that Stonewall Beach Property is

4  currently worth at least $13,000,000.  The Court finds Spellman's

5  analysis of the value of the Stonewall Beach Property much more

6  credible and well supported than that of Spence.  There was a firm

7  offer for the property for $12,000,000 in 2001 and Spellman

8  testified that it might now be worth as much as $16,000,000 and that

9  the real estate values on Martha's Vineyard have been, and are,

10  increasing.  Stonewall Beach Property will retain this value

11  notwithstanding the likely construction on the Cohen property.

12  Spellman testified that there were no ocean front properties of this

13  price range sold in 2004 and that there are few properties

14  available.  If it were necessary to sell Stonewall Beach Property,

15  it is likely that there would be multiple offers for this prime

16  piece of realty, as Spellman testified.  This has already been shown

17  -- Debtor received two offers of $12,000,000 and $12,100,000,

18  respectively -- when in 2001 the Monterey State Court required

19  Debtor to sell the property.

20      Moreover, assuming arguendo, the Stonewall Beach Property was

21  sold for the extremely low price of $9,000,000 one year from now,

22  Debtor has shown that she has sufficient equity in her interest in

23  that property to cover the adequate protection payment Debtor agreed

24  to pay Creditor.  Debtor can clearly pay Creditor for whatever

25  interest the California State Court determines Creditor may have in

26  the two properties.

27      Further, Debtor testified without contradiction that there is

28  over $450,000 in equity in the Family Residence and the value of

1   that property is increasing.  This cushion is more than adequate to

2   protect Creditor while the automatic stay of the Plan is in place.

3        The Court finds the Plan is feasible.

4

5                        D.  Chapter 7 Test

6        A Chapter 11 plan must propose to pay creditors holding

7   impaired claims who do not vote to accept the plan at least as much

8   as the creditor would receive in liquidation under Chapter 7,

9   pursuant to 11 U.S.C. §1129(a)(7)(A)(ii); this is commonly referred

10  to as the "best interest of creditors test", or the "Chapter 7

11  test".  The Plan proposes to distribute to Creditor any amounts

12  required upon a final determination by the California State Court

13  that Debtor is liable to Creditor.

14       Creditor contends that in a liquidation, Creditor would be paid

15  in full since Debtor has over $13,800,000 in equity in her various

16  properties and only $1,900,000 in administrative and general

17  unsecured claims.  Creditor asserts that in a Chapter 7 liquidation,

18  it would receive half of the proceeds from sale of the Stonewall

19  Beach Property and the Family Residence.  However, the Court finds

20  that this is not the case.

21       Under the Plan, Creditor is to be paid in full upon a

22  determination of its claims, if any, against Debtor and its

23  interests, if any, in property of the estate.  Creditor will receive

24  exactly what it is entitled to once the California State Court

25  litigation over the parties' respective rights has been concluded.

26  In a Chapter 7 liquidation, Creditor would not receive any portion

27  of the proceeds from a sale of Stonewall Beach Property or the

28  Family Residence until the respective rights of Debtor and Creditor

1   in those properties is determined.  Creditor assumes that it would

2   be paid from any sale of Stonewall Beach Property and the Family

3   Residence, but the Chapter 7 trustee would litigate -- and the

4   bankruptcy court would determine -- what, if any, claims Creditor

5   had against Debtor prior to distributing monies to it.  This is

6   precisely what Debtor proposes to do under the Plan.  The Chapter 7

7   trustee would not need a bond to litigate Creditor's claims -- the

8   Chapter 7 trustee could do the same thing Debtor is doing under the

9   Plan.  Creditor's argument is premised on Debtor being denied her

10  day in court if the bankruptcy case were converted to chapter 7 --

11  but Debtor's estate would have the same rights to contest Creditor's

12  claim in a Chapter 7 that Debtor does in a Chapter 11.  The Court

13  finds that the Chapter 7 test is met.

14

15                    E.  Absolute Priority Rule

16      The Plan has been accepted by two of its four classes:

17      Classes 1, 2, 4, 5, 6, 8, 9, 10, 11 and 15 are unimpaired and

18  therefore deemed to accept pursuant to §1126(f).

19      Classes 12[20] and 16 are impaired and voted to accept.

20      Classes 3[21] and 14 are impaired and did not vote.

21  _____

22      [20] Creditor objects to confirmation of the Plan on the basis
    that because the general unsecured creditors are receiving post-
23  petition interest, they are actually unimpaired and cannot vote on
    the plan.  Debtor and the Committee assert that because Class 12 is
24  receiving less interest then they would be allowed under either
    state law or their contracts, Class 12 is impaired.  Because Class
25  16 -- the claim of Monterey County Bank -- is impaired and voted
    for the Plan, whether Class 12 is impaired is irrelevant because
26  Debtor and the Committee have an impaired assenting class. In any
    event, the Court agrees with Debtor and the Committee that the
27  general unsecured creditors are impaired under the Plan.

28      [21] Class 3 is the allowed secured claim of Wells Fargo Bank.
    Debtor and Wells Fargo Bank have entered into a stipulation
    resolving the objection to the Plan and rendering Wells Fargo Bank

1    Classes 7 and 13 are intentionally omitted.

2    Compliance with the Absolute Priority Rule is one of two pre-

3  requisites for "cramdown", which is permitted by 11 U.S.C.

4  §1129(b)(1) if a plan fails to meet the requirement of 11 U.S.C.

5  §1129(a)(8) that each impaired class has voted to accept the plan,

6  but does meet each other applicable requirement of 11 U.S.C.

7  §1129(a):

> ... if all of the applicable requirements of
> subsection (a) of this section other than
> paragraph (8) are met with respect to a plan,
> the court, on request of the proponent of the
> plan, shall confirm the plan notwithstanding the
> requirements of such paragraph if the plan does
> not discriminate unfairly, and is fair and
> equitable, with respect to each class of claims
> or interests that is impaired under, and has not
> accepted, the plan.

14  Debtor and the Committee request confirmation under the "cramdown"

15  provisions of 11 U.S.C. §1129(b)(1).

16    With respect to the first prerequisite for cramdown, Creditor

17  complains that the Plan unfairly discriminates against it because,

18  under the Plan, the general unsecured creditors are paid in full in

19  cash with post-petition interest while it receives no payment of any

20  kind.  First, Creditor has asserts a $168,839.05 unsecured claim

21  against the estate.  Creditor's claim is the subject of a pending

22  objection.  This Court's order confirming the Plan will provide for

23  payment of Creditor's unsecured claim with post-petition interest if

24  and when allowed.  In addition, Creditor claims an <u>ownership</u>

25  (community property) interest in the Stonewall Beach Property and

26  Family Residence.  However, under <u>In re Johnston</u>, 21 F.3d 323 (9th

unimpaired.

1 Cir. 1994), the classification and treatment of Creditor's claim

2 complies with 11 U.S.C. §1129(b)(1).

3     In <u>Johnston</u>, creditor Steelcase held a claim that was the

4 subject of ongoing litigation and was provided for in a separate

5 class. Under the plan of reorganization, all unsecured claims were

6 to be paid in full, plus interest. Payment to Steelcase was

7 contingent upon the success of the litigation. The plan called for

8 the claim to be paid in full within 120 days of the entry of the

9 judgment. The Ninth Circuit held that the treatment of Steelcase's

10 claim was not unfair and discriminatory treatment because there were

11 reasonable, nondiscriminatory reasons for the separate treatment.

12     In this case, there are reasonable, nondiscriminatory reasons

13 for the treatment of Creditor's claim. First, Creditor's claim is

14 disputed and is in the process of being litigated. The Plan

15 provides for Creditor's claim to be paid in full once determined by

16 the California State Court. Chapter 11 plans routinely and

17 appropriately provide that a creditor whose claim is disputed has to

18 wait to be paid until the dispute over the claim has been resolved.

19     As noted above, Creditor claims a community property interest

20 in the Stonewall Beach Property and the Family Residence. At this

21 point, Creditor is not entitled to post-petition interest on any

22 state court order, so that fact that general unsecured creditors are

23 receiving post-petition interest on their claims and the Plan does

24 not specifically provide the same for Creditor is not unfair

25 discrimination. If the California State Court determines that

26 Creditor is entitled to post-petition interest, Debtor shall provide

27 for that payment, subject to her offsets.

28

MEMORANDUM DECISION OVERRULING
OBJECTION TO CONFIRMATION AND
CONFIRMING JOINT PLAN OF REORGANIZATION

Further, the two properties in which Creditor asserts an interest are being retained as property of the estate under the Plan and will be available to satisfy Creditor's claim if the California State Court determines that it has one. If the California State Court awards Creditor with a community property interest in Stonewall Beach Property and the property ultimately sells for $13,000,000 or $16,000,000 or more, Creditor will benefit from the higher price and receive even more money from the property. Creditor's downside risk as an owner of Stonewall Beach Property has been essentially eliminated by Debtor's agreement that any diminution of the value of the Stonewall Beach Property below $12,000,000 shall come out of Debtor's share of the sale proceeds. As demonstrated above, even if the Stonewall Beach Property were to sell for as little as $9,000,000 next year, there is sufficient equity in Debtor's interest in the property to adequately protect Creditor's interest.

The second prerequisite for cramdown -- fair and equitable treatment of an impaired class that did not vote to accept a plan -- is defined for purposes of unsecured creditors by 11 U.S.C. §1129(b)(2)(B), which embodies what is commonly referred to as the Absolute Priority Rule:

> ... (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or
>
> (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

Thus, as used in 11 U.S.C. §1129(b)(2)(B), the "phrase 'fair and equitable' is not a vague exhortation to bankruptcy judges that they do the right thing; rather, it implements the so-called absolute priority rule under which an objecting class must be paid in full before any claim or interest junior to it gets anything at all." <u>In re Perez</u>, 30 F.3d 1209, 1212-13 (9th Cir. 1994).

Creditor argues that the Absolute Priority Rule is not met here because Debtor will continue in existence and in possession of her property, even though Creditor will not be paid in full. However, this is true for any disputed claim that is being litigated post-confirmation. In this connection, the Absolute Priority Rule has two parts and 11 U.S.C. §1129(b)(2)(B)(i) provides that "each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim."

Here, Creditor retains, as of the Effective Date of the Plan, value equal to the allowed amount of its claim. First, Creditor does not have an allowed claim, so there is no legal requirement that it "retain" anything under the Bankruptcy Code. However, the Plan provides that Creditor's possible interest in Stonewall Beach Property will be repaid from a sale of the property or other means by Debtor to satisfy the debt if the California State Court determines that it has such an interest. The same holds true for the Family Residence. There is no need for Debtor to provide a reserve or post a bond because the Stonewall Beach Property and the Family Residence remain property of the bankruptcy estate under the Plan and, as the Court has found and finds today, adequately protect Creditor's interests. Plus, under 11 U.S.C. §363 and §364, Debtor

1  cannot sell or encumber those properties without further order of
2  the Court.
3
4                                    IV.
5                                CONCLUSION
6      Debtor and Creditor engaged in contentious litigation in the
7  Dissolution Proceeding.  Debtor filed this Chapter 11 case in part
8  to permit her to remedy what she considers to be injustices
9  inflicted upon her in the Dissolution Proceeding.  Debtor is unable
10  to provide a bond to stay the Dissolution Proceeding while she
11  pursues her appeals.  The Plan is designed to maintain the status
12  quo and protect Creditor while Debtor appeals the Dissolution
13  Proceeding.  The Court finds that the Plan appropriately protects
14  Creditor during the appeals and is an appropriate use of Chapter 11.
15      For the reasons set forth above, Creditor's objection to
16  confirmation of the Plan is overruled and the Plan shall be
17  confirmed.  Counsel for Debtor shall submit a form of order so
18  providing, after review as to form by counsel for Creditor and the
19  Committee.
20
21  Dated:  July 25, 2005
22
23                                    ARTHUR S. WEISSBRODT
                                     UNITED STATES BANKRUPTCY JUDGE
24
25
26
27
28

MEMORANDUM DECISION OVERRULING
OBJECTION TO CONFIRMATION AND
CONFIRMING JOINT PLAN OF REORGANIZATION

**Case No.** 01-53251

## UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### CERTIFICATE OF MAILING

I, the undersigned, a regularly appointed and qualified Administrative Law Clerk in the office of the Bankruptcy Judges of the United States Bankruptcy Court for the Northern District of California, San Jose, California hereby certify:

That I am familiar with the method by which items to be dispatched in official mail from the Clerk's Office of the United States Bankruptcy Court in San Jose, California are processed on a daily basis: all such items are placed in a designated bin in the Clerk's office in a sealed envelope bearing the address of the addressee, from which they are collected at least daily, franked, and deposited in the United States Mail, postage pre-paid, by the staff of the Clerk's Office of the Court;

That, in the performance of my duties, on the date set forth below, I served the **MEMORANDUM DECISION OVERRULING OBJECTION TO CONFIRMATION AND CONFIRMING JOINT PLAN OF REORGANIZATION** in the above case on each party listed below by depositing a copy of that document in a sealed envelope, addressed as set forth, in the designated collection bin for franking, and mailing:

Terrance L. Stinnett, Esq.
Dennis D. Davis, Esq.
Goldberg, Stinnett, Meyers &
Davis
44 Montgomery St. #2900
San Francisco, CA 94104

John D. Fiero, Esq.
Pachulski, Stang, Ziehl,
Young, Jones & Weintraub P.C.
3 Embarcadero Center #1020
San Francisco, CA 94111

James F. Lewin
Wells Fargo Bank
P.O. Box 12289
El Cajon, CA 92022-2289

Lance N. Jurich, Esq.
Loeb & Loeb LLP
10100 Santa Monica Blvd. #2200
Los Angeles, CA 90067-4164

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on July 26, 2005, at San Jose, California.

KRISTI S. GERRIOR